24 N.J. Super. 10 (1952)
93 A.2d 417
HARRY L. ABBOTT AND ANOTHER, ADMINISTRATORS, ETC., PLAINTIFFS-APPELLANTS,
v.
C. PAUL VICO AND ANOTHER, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued October 6, 1952.
Decided December 15, 1952.
*12 Before Judges McGEEHAN, BIGELOW and SMALLEY.
Mr. Allan L. Tumarkin argued the cause for the appellants.
Mr. Joseph L. Freiman argued the cause for the respondents.
The opinion of the court was delivered by BIGELOW, J.A.D.
The plaintiffs, as administrators of the estate of George Abdy, deceased, brought their action for rent of leased premises situate in the Borough of Brooklyn, New York. The defendants counterclaimed for the amount of rent paid in excess of that permitted by the law of New York and also for damages for unlawful eviction, and for the return of money deposited as security. At the conclusion of the plaintiffs' case the court dismissed their complaint, and the trial proceeded on the counterclaim. The jury returned a verdict in favor of the defendants for $10,920, and accordingly the judgment was entered from which the plaintiffs appeal.
*13 The decedent was lessee of the ground floor loft of No. 360 39th Street, Brooklyn, and for a while carried on an embroidery manufacturing business there. Then he sublet or rented the loft or most of it, together with the embroidery machinery, chairs, tables and other equipment to the defendants for a term of two years, beginning April 1, 1946. The rent paid by decedent for the loft was $77.50 a month, and the rent he charged defendants for the loft, plus the use of the chattels, was $1,000 a month.
In November 1946 defendants shut down their business and left the premises unoccupied. A few days later decedent put a padlock on the door leading into the store. Defendants had paid the November rent in advance; they never paid any rent thereafter.
The plaintiffs sue for rent from December 1946 to March 31, 1948, the end of the two-year term.
At the conclusion of the plaintiffs' case defendants moved to dismiss the plaintiffs' action on the ground that they had not proved that decedent had given to defendants the notice or statement of rent required by section 3 of the Emergency Commercial Space Rent Control Law of the State of New York, Laws of 1945, c. 3. Upon the argument of the motion before the trial court, counsel for plaintiffs conceded that if the law applied to the letting by decedent to defendants, then the giving of the notice was necessary, but he argued that the statute did not control. "We have not complied with the law, because we take the position that the law does not apply to us." The court determined that the New York statute was applicable and dismissed the complaint. Was that error?
The New York statute controls the renting of "space used or occupied for commercial purposes"; it establishes maximum rents "for the use or occupancy of the whole or a part of any part of any commercial space." The plaintiffs argue that a letting of space together with machinery is outside the scope of the statute. We think not. It appears to us true that the New York Legislature intended to regulate the renting of *14 real estate and not the chattels that are used in the real estate. But a landlord is not permitted to escape the statutory limitations on the renting of commercial space by the expedient of coupling realty and personalty in a single lease. 24 Hours Service Garage v. Marko Motor Service, 105 N.Y.S.2d 680 (App. Div. 1951), lends support to this view. There was no error in the dismissal of the complaint.
The verdict for respondents on their counterclaim was based, in part at least, on a finding that decedent had evicted them. Plaintiffs argue that the evidence does not support such a finding. The respondent Vico testified that toward the middle of November 1946 the bottom fell out of the embroidery market. "We had a lot of goods in the place but we got cancellations and everything." Their customers told them "Stop." "And because of the cancellations that you had gotten, what did you do as far as the operation of your plant was concerned? Well, we shut down." Asked if he and his partner continued to go to the plant every day, he answered, "No. We were looking for business and, as long as we had none, there was no reason to go." But a day or two before Thanksgiving Day they took to the plant a machine they had had repaired, and found the door padlocked. They telephoned Mr. Abdy and he came, unlocked the door and let them in. After they had put the machine inside, Abdy relocked the door.
"And were you able to stay in the place after you returned the sewing machine? No." "And why not? Well, for one thing we had no work; * * * We were shut down because we had no work, so there was no  I couldn't imagine why we would stay there at the moment."
Vico never went back to the shop after that. He was asked about the rent that fell due December 1. "We weren't able to pay them. We weren't doing business."
The other counterclaimant, Dal Cero, testified that he made an effort to get into the loft early in December. "I called up Mr. Abdy. I explained that I had my tools there." *15 About the same time Dal Cero obtained steady employment at an average wage of over $100 a week.
There was a conference early in January at which were present the decedent Abdy with his lawyer, Mr. Miller, and the respondents and their lawyer, Mr. Pajonk.
Pajonk related:
"Mr. Vico said to Mr. Abdy, `George, that was a fine thing to put the padlock on the door.' And Mr. Abdy immediately responded by saying, `Sure, I put the lock on the door, and what do you expect me to do? I wasn't going to get stuck.'"
And further:
"We were discussing the possibility of continuance. * * * But if Mr. Abdy objected to our terms of settlement whereby we would get a return of some of the money, because we had discussed the $5,000.00 deposit and the $2,400.00 advance rent, which was a total of $7,400.00 that Mr. Abdy had, and we discussed the possibility of working a settlement out, or getting possession back.
I see. Were you able to get possession of the premises? We couldn't make any headway. They were adamant in their feeling that they were so far ahead of us, they didn't have to give us anything.
Now, when the three of you left Mr. Miller's office, where did you go? When we went downstairs and told them we didn't stand any chance, we went to the Consolidated Edison Company a few blocks from Mr. Miller's office, and we had the electric power in the factory premises shut off, because at that time we knew we couldn't get the place back as a result of that conference."
The electricity was charged to respondents and that, coupled with the fact that they had no more use for it, explains their having the service discontinued.
The version of decedent's lawyer, Miller, was not radically different:
"What did they say about continuing operation of the plant? Well, they said that, to use their expression at the time, that the bottom had fallen out of the embroidery business and that they couldn't afford to say there and pay that rental * * *. They did state that, also, at that time, that they would be glad to carry on and stay there if the rent was reduced to about $300.00 or $350.00 a month."
*16 The padlocking of the door to the leased premises is relied upon by respondents as the eviction. An eviction is "an act of a permanent character done by the landlord in order to deprive, and which had the effect of depriving, the tenant of the use of the thing demised, or of a part of it." Upton v. Townend, 17 C.B. 30, at p. 72 (1855); Meeker v. Spalsbury, 66 N.J.L. 60 (Sup. Ct. 1901).
A fair interpretation of the evidence before us does not indicate that Abdy intended to deprive or did deprive the respondents of the enjoyment of the premises. His purpose in padlocking the premises may well have been to protect it from marauders while the tenants were absent. The time that both respondents wanted to enter the store, Abdy immediately let them in. What happened when Dal Cero wished to get his tools is not clear. The respondents' business had collapsed; they were unable to pay the December rent; they each sought and found other employment about the first of December. At the January conference they endeavored to obtain a reduction in rent and a release of some of the security, so that they might start in business again. In our opinion the verdict, so far as it is based upon an eviction, cannot stand. Cohen v. Korol, 9 N.J. Super. 182 (App. Div. 1950).
One of the claims included in the counterclaim was based on the New York Emergency Commercial Space Rent Control Law, which gives an action for the recovery of rent paid in excess of the maximum determined in accordance with the statute. The plaintiffs pleaded that the period of time within which the action could be brought had expired before the action was begun. But the court overruled the plea and submitted the claim to the jury. Section 11 of the statute provides:
"Nothing contained in this act shall create any claim or cause of action in favor of a tenant against a landlord to recover moneys paid as rent for commercial space for a period prior to the twenty-fourth day of January, nineteen hundred forty-five; nor shall any cause of action in favor of a tenant against a landlord which shall have been or shall be created by this act be instituted unless begun *17 within one year after the cause of action accrued except that in the case of any such cause of action accrued prior to April eleventh, nineteen hundred forty-nine, such cause of action shall be barred unless begun within one year from such date."
When a statutory cause of action is given upon a condition that it shall expire after a certain period of time has elapsed, no action begun after the period has elapsed can be maintained either in the state which created the cause of action, or in any other state. Restatement, Conflict of Laws, § 605; Beale, Conflict of Laws, § 605. Examples of statutes in which the period of time prescribed for bringing the action operates on the right of action itself, and not on the remedy alone, are our Death Act. Seitter v. West Jersey, etc., R.R. Co., 79 N.J.L. 277 (Sup. Ct. 1910). And our statute for the recovery of money lost in gambling. Shack v. Dickenhorst, 99 N.J.L. 120 (E. & A. 1923); Zabady v. Frame, 22 N.J. Super. 68 (App. Div. 1952). And likewise the Federal Employer's Liability Act. Atlantic Coast Line v. Burnette, 239 U.S. 199, 36 S.Ct. 75, 60 L.Ed. 226 (1915). Also the limitation contained in the Federal Housing and Rent Acts, U.S.C.A., Title 50 App., § 1895(c). Young v. Margiotta, 136 Conn. 429, 71 A.2d 924 (Conn. Sup. Ct. Err. 1950). Judge Biggs, in Pennsylvania Co. v. Deckert, 123 F.2d 979, 985 (C.C.A. 3, 1941), correctly stated:
"It has been held almost universally that when a statute creating a new cause of action contains in itself a statute of limitations, the limitation imposed becomes an integral part of the right of action created by the statute and so limits it that an aggrieved person cannot maintain his suit after the time fixed by the statute has expired."
We are satisfied that the New York Legislature intended the statutory cause of action created by the Rent Control Law to expire with the lapse of the periods mentioned in section 11. The statutory cause of action which is pleaded in respondents' amended counterclaim arose in 1946. It expired by force of the limitation contained in the statute April 11, 1950. The present action was not *18 instituted until July 29, 1950, and the counterclaim was not filed until April 10, 1951. The trial court, by overruling appellants' motion to dismiss and by submitting this cause to the jury, enlarged rather than enforced the right of action created by the Legislature of New York.
Judgment for the defendants on the complaint is affirmed. The judgment on the counterclaim is reversed and a new trial ordered. No costs on appeal are allowed to either party as against the other.