[Nos. 44090, 44091. En Banc. December 23, 1976.]

RETAIL STORE EMPLOYEES UNION, LOCAL 1001, ET AL, *Respondents*, v. WASHINGTON SURVEYING AND RATING BUREAU, ET AL, *Appellants*.

888

*George H. Bovingdon* (of *Clarke & Bovingdon*), for appellants.

*James H. Webster, Durning, Smith & Brucker,* by *Marvin B. Durning, Slade Gorton, Attorney General,* and *Ernest M. Furnia, Assistant,* for respondents.

HOROWITZ, J.—Defendants appeal a summary judgment ordering removal of the trustees holding all the stock of the Washington Bureau (a corporation) and appointing substitute trustees to manage the unincorporated and separate business of the Washington Surveying and Rating Bureau (Bureau). We reverse.

The defendant Bureau is an unincorporated insurance rating organization. Its present manager is defendant Robert Pederson. The Bureau rates geographical areas and individual structures for the purpose of filing proposed rates on behalf of insurance company subscribers to its services with the Insurance Commissioner for standard form fire insurance policies.[1] It is the only such rating organization licensed to operate in the state, and approximately 200 insurance companies subscribe to the Bureau's services.

The Washington Committee (Committee) is a group of representatives of the major insurance companies which subscribe to the Bureau. In 1926, J. K. Woolley, the owner and operator of the Bureau, agreed to sell the Bureau to the Committee. The purchase was made with the proceeds of assessments levied against the Bureau's subscribers.

The Washington Bureau (Corporation), a holding corporation, was also formed in 1926 by Fred G. Clarke and Joseph Oakland. Title to the assets of the Bureau was conveyed by the Committee to Clarke and Oakland for the benefit of the Bureau's subscribers. Clarke and Oakland conveyed these assets to the Corporation in full payment of its capital stock.

In 1944, the United States Supreme Court held that the antitrust laws apply to the business of insurance as interstate commerce. *United States v. South-Eastern Underwriters Ass'n*, 322 U.S. 533, 88 L. Ed. 1440, 64 S. Ct. 1162

---

[1] Defendants' reply brief describes the Bureau's functions in more detail, as follows: "It makes proposed rate filings on behalf of subscribers, either individually or in groups; such filings made with the Insurance Department of the State. It provides to its subscribers all of the technical and statistical information it assembles, whether or not it is requested to file on behalf of such subscribers. Subsequent to the filing and if approved by the Insurance Commissioner, the Bureau has two principal functions with respect thereto: (1) To apply a point system contained in the grading system on file with the Commissioner, thus determining relative fire protection characteristics of cities and fire protection districts; (2) Physically to inspect commercial risks for the purpose of determining existence or non-existence of physical characteristics under the Commissioner-approved rating schedules, and which characteristics would result in either debit or credit in connection with rate ascertainment."

(1944). This decision made it imperative to the insurance industry that rating bureaus, through which insurance companies pool their experience and set their rates in combination with other companies, be legalized. The alternative of an individual company pricing system was considered "impossible" in view of the nature of the insurance business and its dependence upon past statistics for estimating future costs. W. Rodda, *Fire and Property Insurance* 539-40 (1956). The solution came from Congress in 1945 with the McCarran Act. 15 U.S.C. §§ 1011-15 (1970). Congress relied upon the holding in *Parker v. Brown*, 317 U.S. 341, 87 L. Ed. 315, 63 S. Ct. 307 (1943) (states may regulate interstate commerce in respects in which Congress has not acted), and suspended until 1948 the application of the antitrust laws to the insurance business in order to give the states the opportunity to enact statutes regulating combinations of insurance companies for the purpose of setting rates.

Washington had long had a statute regulating rating bureaus. Laws of 1911, ch. 49, § 74, p. 210. This statute declared the business of conducting a rating bureau to be "public service in character", and required each rating bureau to be conducted on a nonprofit basis and to make its services equally available to all insurance companies, agents, brokers, and property owners.

In 1947, Washington enacted an entirely new regulatory act governing rating bureaus. RCW 48.19. This new statutory scheme is more comprehensive and detailed than its predecessor. For example, the prior statute made no requirement concerning how a rating bureau is to be organized. RCW 48.19.170(2) required the ownership of the bureau to be vested in trustees for all its subscribers under a trust agreement approved by the Commissioner.

To enable the Bureau to qualify for a license as a rating bureau under RCW 48.19, all shares of the stock of the Corporation were placed in trust by the Corporation's shareholders pursuant to a September 22, 1947, trust declaration for the use and benefit of the insurance company subscribers to the Bureau. The trust declaration named the

trustees of the stock and provided a method for designating their successors but contained no specification of trust powers. This declaration of trust was approved by the then Insurance Commissioner on September 26, 1947. After intervening changes, the Corporation's stock is now held by three defendant trustees for all the insurance company subscribers, W. M. Hemion, George W. Clarke, and Fred G. Clarke, Jr.

The Retail Store Employees Union, Local 1001, and 15 individual members of the union brought suit on December 20, 1974, against the Bureau, its manager, the corporation, the three trustees, and the Committee and its members. Named in the complaint but not served are the approximately 200 insurance company subscribers to the Bureau's services.

The complaint alleges defendants are in violation of RCW 48.19.170 and the declaration of trust, as follows: (1) the trustees permit the subscriber insurance companies to direct the affairs of the Bureau, thereby violating their obligation to see the Bureau is operated independently of any insurers except to the extent the insurers are subscribers to the Bureau; (2) the Committee has usurped the responsibilities of the trustees, and in fact directs the operations of the Bureau; (3) the manager of the Bureau takes directions from the Committee and not the trustees; and (4) the insurers maintain direct control over the Committee by selecting and directing its members, and thereby maintain direct control over the Bureau. The complaint also alleges that as a direct result of the conduct of defendants, the Bureau has failed to properly rate numerous buildings and structures within Washington, resulting in improperly high fire insurance premiums to the detriment of the plaintiffs. Plaintiffs prayed for removal of the trustees, appointment of independent trustees, the interim appointment of a receiver, and the enjoining of the other defendants from improperly directing the operations of the Bureau.

In September 1975, the Insurance Commissioner con-

ducted a hearing concerning the Bureau.[2] Subsequently the Commissioner was permitted to intervene in this action, and his complaint makes allegations and seeks relief substantially identical to that sought by the other plaintiffs.[3] For convenience, references hereinafter to plaintiffs may be treated as including the Commissioner unless the context otherwise requires.

On November 17, 1975, plaintiffs successfully moved for summary judgment generally based on claims of violation of trust duties, conflict of interests, and committee and subscriber illegal control of the Bureau. In its written order of summary judgment the trial court ordered defendants W. M. Hemion, George W. Clarke, and Fred G. Clarke, Jr., be removed as trustees of the Bureau and as officers and trustees of the Corporation. The judgment also orders the appointment of three new trustees and sets forth their duties as follows:

> The Trustees are hereby empowered and directed to conduct the [Bureau] and [Corporation] pursuant to RCW 48.19.170 (2) as a non-profit public service institution which shall not be connected with any insurer or group of insurers except to the extent that any such

[2]The record is silent concerning the purpose or result of the hearing. Defendants make the undisputed claim that no order was entered following the hearing.

[3]The standing of the Insurance Commissioner to bring this action rests on RCW 48.02.080 (3), (we later discuss), which empowers the Commissioner to bring a court action to enjoin any persons from violating any provision of the insurance code. Standing to assert a claim for relief does not require a showing of probable success. The persons sued may assert any defenses they may have to any such action —jurisdictional, procedural, and substantive. The standing of the other plaintiffs is challenged by the defendants because (a) plaintiffs have proved no damages whatsoever to themselves; (b) they are not beneficiaries of the trust under RCW 48.19.170 and have no interest in the subject matter of the trust, nor has RCW 48.19.170 manifested an intention to benefit the plaintiffs so as to confer upon them a protectable interest on which to base standing. However, since the Commissioner and the other plaintiffs make similar arguments and seek the same relief, issues which we determine in any event, we need not rule on defendants' contention that the plaintiffs other than the Commissioner lack standing. *Eastlake Community Council v. Roanoke Associates, Inc.*, 82 Wn.2d 475, 477 n.1, 513 P.2d 36 (1973).

insurer may be a subscriber to its services. The Trustees are further authorized and empowered to do all things necessary and proper to the lawful operation of the Bureau.

The summary judgment was appealed by the Bureau, the Corporation, the removed trustees, and the manager of the Bureau. On motion to this court the judgment was stayed pending appeal. Plaintiffs moved to dismiss the appeal claiming the removed defendant trustees and the Bureau's manager were not "aggrieved parties" (ROA I-14), having no direct, personal interest affected by the judgment, and because the Bureau had not authorized the appeal. This motion was passed to the merits.

## Standing To Appeal

It is not denied defendants authorized this appeal on behalf of each respectively. The controlling question, however, on whether defendants' appeal should be dismissed is whether the removed trustees are aggrieved parties so as to have standing to appeal. We hold they have such standing on either of two grounds and deny the motion.

■ A trustee, in his fiduciary or representative capacity, is aggrieved by a judgment which threatens the continuance of the trust in the form directed by the trustor, whether or not the beneficiaries appeal. He is more than a mere stakeholder. *Estate of Ferrall*, 33 Cal. 2d 202, 200 P.2d 1, 6 A.L.R.2d 142 (1948); *Toledo Trust Co. v. Farmer*, 165 Ohio St. 378, 135 N.E.2d 356 (1956).

This rule is applicable to determining the trustees' standing in the instant case. The purpose of the rating bureau trust, as stated in the trust declaration, is to qualify the Bureau under RCW 48.19.170 for a license to operate as a rating organization. To qualify, the rating organization may not be "connected with any insurer or insurers except to the extent that any such insurer may be a subscriber to its services." RCW 48.19.170(2)(c). As next appears, if effect be given to both the terms of the trust and the trial court's judgment, the Bureau is placed in the position of violating this statutory requirement and the express purpose of the

trust is thereby defeated. The trial court held the trustees of the stock of the Corporation must themselves administer the affairs of the Bureau, while the trust declaration states in a provision approved by the then Insurance Commissioner and not voided by the trial court that these same trustees "are at all times subject to the direction of the subscribers to the [Bureau] and that each may at any time be removed by a majority vote of such subscribers." With the ultimate responsibility for the management of the Bureau thus placed by the judgment in the hands of the insurer subscribers acting through the trustees in violation of RCW 48.19.170(2)(c), the very purpose for which the trust was created—securing and maintaining a license for the Bureau—is threatened. The trial court has no authority to disregard this statute. The trustees have a right to make this claim on appeal even if it is ultimately rejected. The trustees therefore have standing and indeed a duty to appeal to protect the integrity and fundamental purpose of the trust.

■ The trustees' standing may be established upon an alternative ground. Even if the trial court had directed that the insurance company subscribers to the Bureau may no longer direct the trustees, "for all its subscribers under such trust agreement as is approved by the commissioner" (RCW 48.19.170(2)(b)), the trustees would still have standing to appeal to protect the interest of the beneficiary subscribers. A trustee who is a party to an action in representative capacity need not have a personal interest in the controversy to have a right to appeal if it is his duty to appeal in order to protect the interest of those whom he represents. *Waterbury Trust Co. v. Porter*, 130 Conn. 494, 35 A.2d 837 (1944); *O'Leary v. McGuinness*, 140 Conn. 80, 98 A.2d 660 (1953); *Cavanaugh v. Art Hardware & Mfg. Co.*, 124 Wash. 243, 245-46, 214 P. 152 (1923); Restatement (Second) of Trusts § 178, comment *a* (1959). Here RCW 48.19.170(2)(b) and the trust declaration provide the trustees shall be trustees for the subscribers. The rule recognizing the trustees' standing to protect the subscribers' inter-

ests is especially important because the subscribers are not before the court, having not been served with process. Plaintiffs' cases are distinguishable.

Trustees' Duty To Administer the Bureau

On the merits we must consider (1) Whether the insurance code, particularly RCW 48.19.170 (2) (b) (c), requires a rating organization to be administered and managed by trustees pursuant to that statute. The trial court accepted plaintiffs' position that the statute so requires; (2) If the answer to the first question is in the negative, the issue remaining is the nature of the relief that should be awarded in this case. For reasons later discussed, we believe the trial court erred in granting summary judgment to plaintiffs and reverse and dismiss the action.

RCW 48.19.170 (2) reads as follows:

(2) Any rating organization proposing to act as such as to insurance under standard form fire policies, shall be licensed only if all the following conditions are complied with:

(a) The applicant and the operators of such rating organization shall be domiciled in and shall actually reside in this state.

(b) The ownership of such rating organization shall be vested in trustees for all its subscribers under such trust agreement as is approved by the commissioner, and the rating organization shall be and shall be conducted as a nonprofit public service institution.

(c) Such rating organization shall not be connected with any insurer or insurers except to the extent that any such insurer may be a subscriber to its services.

The licensing provisions do not specifically require or empower a particular person or entity to administer or manage the rating organization. Neither the legislative history of these provisions nor any other statute supplies the deficiency. RCW 48.19.170 (2) (b) does specify, in one aspect, the manner in which the rating organization is to be administered and managed ("as a nonprofit public service institution") and RCW 48.19.170 (2) (c) does specify that an insurer may "not be connected with" the rating organiza-

tion, which would preclude an insurer from administering or managing the rating organization.

The plaintiffs contend and the trial court held, nevertheless, that a proper interpretation of RCW 48.19.170(2) (with its undefined terms) reveals a requirement that the trustees must actively administer and manage the rating organization in order to receive or retain a license. Plaintiffs rely upon the language of RCW 48.19.170(2)(b), which requires the ownership of the rating organization to be vested "in trustees for all its subscribers . . ."

Ownership, plaintiffs argue, must include the right of control, and since the rating organization must be conducted as a nonprofit public service institution, this duty falls upon its "owner," the trustees, old and new respectively.

Plaintiffs point to no other provision in RCW 48.19 or elsewhere, or in the trust declaration, directing the trustees for the Bureau subscribers to administer and operate the rating organization. We disagree with plaintiffs' interpretation of RCW 48.19.170(2). Based upon the arguments set out below, we conclude the duty to administer and operate the rating organization does not rest with the trustees.

■ We first respond to plaintiffs' interpretation of the word "ownership" in RCW 48.19.170(2). Plaintiffs contend the word has a fixed meaning defined by the common law and ordinary meaning of the word. We disagree. The word does not have a fixed meaning and is not defined in the statute. In such a case, therefore, regard must be had to the statutory object sought to be accomplished by the use of the word "ownership," and the context and subject matter in which it is used. *Cady v. Kerr*, 11 Wn.2d 1, 10, 118 P.2d 182, 137 A.L.R. 713 (1941). Recently our Court of Appeals, in referring to the word "owner" used in an automobile insurance policy, stated after noting the word "owner" is an ambiguous term:

The term is, however, a nomen generalissimum and its meaning should be gathered from the context in which it

is used. The term may have many meanings depending upon the circumstances in which it is used.

(Footnote omitted.) *Farmers Ins. Co. v. U.S.F. & G. Co.*, 13 Wn. App. 836, 841, 537 P.2d 839 (1975). Thus, use of the word "ownership" in the subject matter of trusts may refer to any number of collection of rights and powers in property depending upon the circumstances.

> The term "owner" is used in the Restatement of this Subject to indicate a person in whom one or more interests are vested for his own benefit. . . .
> . . . [E]ven if he has parted with some of his interests he may still be termed owner of the thing . . .

Restatement (Second) of Trusts § 2, comment *d* (1959). In construing the words "owner" and "ownership" when used in a statute, their meaning has been given "the widest variety of construction, usually guided in some measure by the objects sought to be accomplished in the particular instance." *Merrill Ry. & Lighting Co. v. Merrill*, 119 Wis. 249, 254, 96 N.W. 686 (1903). A few examples of the varied constructions given to the word "ownership" in statutes may be cited.[4]

Thus, ownership may be in one person and the right of possession or control in another. *Theriot v. Terrebonne*, 195 So. 2d 740, 742-43 (La. App. 1967); *Nye v. James*, 373 S.W.2d 655, 659 (Mo. App. 1963); *McClellan v. F.A. North Co.*, 14 N.J. Misc. 760, 763, 187 A. 337 (1936).

We find, therefore, that whether or not the power or right to control is within the collection of rights and powers

---

[4]*Luebke v. Holtzendorff*, 203 Ark. 141, 145, 157 S.W.2d 770 (1941) (statute entitling person with "ownership" to redeem from tax sale permits person with "almost any right" to redeem); *State ex rel. Thompson-Stearns-Roger v. Schaffner*, 489 S.W.2d 207, 215 (Mo. 1973) (meaning of word "ownership" in taxing statute depends upon context and legislative intent); *Mitchell Aero, Inc. v. Milwaukee*, 42 Wis. 2d 656, 662, 168 N.W.2d 183 (1969) (word "ownership" in tax exemption statute means certain combination of rights determined by purpose of statute); *Aldridge v. Franco Wyoming Oil Co.*, 24 Del. Ch. 126, 150-51, 7 A.2d 753 (1939) (corporation statute giving shareholders "all the rights, powers and privileges of ownership" does not necessarily mean absolute and unqualified ownership, but may mean special, conditional, or legal interest only).

intended by the legislature in this particular use of the word "ownership" cannot be determined without a careful examination of the subject matter, context, and purpose of this statute as later discussed.

■ Of more value in determining the merit of plaintiffs' argument that RCW 48.19.170(2)(b) requires the trustees to administer and operate a rating organization is the contemporaneous, continuing, and practical interpretation given to this section, including the word "ownership", by the agency charged with its administration, the Insurance Commissioner. *Hama Hama Co. v. Shorelines Hearings Bd.*, 85 Wn.2d 441, 448, 536 P.2d 157 (1975). The practices of the Insurance Commissioner at the time of and since the enactment of RCW 48.19 in 1947 reflect the understanding the Commissioner has of this chapter of the insurance code he is charged with enforcing. 2A C. Sands, *Statutes and Statutory Construction* § 49.05, at 238 (4th ed. 1973).

We may place greater reliance than usual upon an administrative statutory interpretation in this case because the Commissioner has been entrusted with very broad discretion and responsibility in the administration of RCW 48.19.170(2)(b) and the other statutes regulating rating organizations. *See Crumpler v. Board of Administration, Employees' Retirement Sys.*, 32 Cal. App. 3d 567, 108 Cal. Rptr. 293 (1973).

The following are among the general and specific powers vested in the Commissioner. RCW 48.02.060(2) states the Commissioner "shall enforce the provisions of this [insurance] code." To aid the Commissioner in this task, he is given broad power to effectuate the provisions of the code through rules and regulations. RCW 48.02.060(3)(a). In addition, the Commissioner is empowered to conduct investigations to determine whether any person has violated any provision of the code (RCW 48.02.060(3)(b)), and may conduct examinations, investigations, and hearings for the efficient administration of any provision of the code. RCW 48.02.060(3)(c). The Commissioner is also given additional

broad and varied powers to enforce the provisions of the code. RCW 48.02.080(1) provides the Commissioner may prosecute an action in court to enforce an order made by him pursuant to a code provision. RCW 48.02.080(2) requires the Commissioner to certify violations of penal provisions of the code to the appropriate local prosecutor. RCW 48.02.080(3) provides that if the Commissioner has cause to believe any person is violating or is about to violate any provision of the code or any regulation or order of the Commissioner, the Commissioner may issue a cease and desist order and bring court action to enjoin the violation.

In chapters 3 and 19 of the code, the Commissioner is given specific or special powers and responsibilities to regulate rating organizations. These powers and responsibilities are in large part directed to insure that rating organizations are in compliance with the licensing requirements of RCW 48.19.170. RCW 48.19.160 states that no rating organization shall do business or make rate filings in Washington unless licensed by the Commissioner. An application for a license must include the following:

(a) A copy of its constitution, its articles of agreement or association, or its certificate of incorporation, or trust agreement, and of its bylaws, rules and regulations governing the conduct of its business;

(b) A list of its members and a list of its subscribers;

(c) The name and address of a resident of this state upon whom notices or orders of the commissioner or process affecting such rating organization may be served, and

(d) A statement of its qualifications as a rating organization.

RCW 48.19.170(1). Upon receipt of the above documents and an application for a license, the Commissioner must then determine if the applicant qualifies for a license under the requirements of RCW 48.19 and other pertinent laws.

(1) If the commissioner finds that the applicant for a license as a rating organization is competent, trustworthy and otherwise qualified so to act, and that its constitution, articles of agreement or association or certificate of incorporation or trust agreement, and its bylaws, rules

and regulations governing the conduct of its business conform to the requirements of law, he shall, upon payment of a license fee of twenty-five dollars, issue a license specifying the kinds of insurance, or subdivisions or class of risk or part or combination thereof for which the applicant is authorized to act as a rating organization.

(2) The commissioner shall grant or deny in whole or in part every such application within sixty days of the date of its filing with him.

RCW 48.19.180(1) and (2). A license is valid for 3 years, unless sooner suspended or revoked by the Commissioner. RCW 48.19.180(3). Thus, if the Commissioner finds a rating organization no longer meets the qualifications for its license, or fails to comply with an order of the Commissioner, the Commissioner may after a hearing suspend or revoke the license of the rating organization. RCW 48.19.190.

In order to determine if a rating organization is in fact operating according to law and is in compliance with the licensing requirements, RCW 48.03.010 requires the Commissioner at least once every 5 years or more often if deemed advisable, to "fully examine" each licensed rating organization. An examination must be comprehensive and include examination of the "systems of internal control" of the rating organization to ascertain they are in conformity with the laws and the organization's own charter and bylaws.

(d) Examinations by the Insurance Commissioner's office include analyses of the various operating accounts, physical inspection of assets, examination of records and files relating to assets and liabilities, policies and practices, surveys of the systems of internal control, accounting procedures, and determination of the financial condition as of the close of the period under examination. Close attention is paid to ascertain whether the business is conducted in conformity with the laws and regulations relating to insurance and employee welfare trusts, and with the charters and bylaws adopted by the governing board of the organization. Insurance examiners work from a manual guide prepared, and continually updated, by a committee of the National Association of Insurance

Commissioners. Detailed auditing of vouchers and other records is performed only to the extent necessary for verification of assets and liabilities.

WAC 284-02-020(2)(d). The examination is conducted by the examination division of the Commissioner's office. WAC 284-02-020(2). RCW 48.03.070(1) gives the Commissioner's office broad investigative powers with which to make the examination.

(1) The commissioner may take depositions, may subpoena witnesses or documentary evidence, administer oaths, and examine under oath any individual relative to the affairs of any person being examined . . .

An examination must be followed by "a full written report" containing facts ascertained from accounts, records, and documents examined and from sworn testimony taken, and proposed conclusions and recommendations as warranted from these facts. RCW 48.03.040. The report is then certified by the Commissioner or the examiner in charge of the examination, and a copy of the certified report is given to the organization examined who may then request a hearing in which to make objections to the report. RCW 48.03.040(2) and (3); WAC 284-02-020(2)(e).

From the enactment of RCW 48.19 in 1947 until 1975 when the Commissioner intervened in this suit begun in 1974, the Commissioner and his predecessors since 1947, in the proper exercise of all the above general and specific powers and responsibilities presumably have fully examined the operation of the Bureau numerous times to determine if it is in conformity with the licensing requirements of RCW 48.19.170(2). The Bureau is the only rating organization licensed in Washington. In this 27-year period, the Commissioner has never found the Bureau's declaration of trust and the behavior of the trustees to be in other than complete reliance with RCW 48.19.170.

The Bureau's license has been renewed nine times since September 1947. Each renewal required the Commissioner to examine the declaration of trust, determine if the trustees are operating in conformity with the declaration, and

determine whether the Bureau and the declaration conformed to the law. In addition, the Bureau presumably has been fully examined at least every 5 years pursuant to RCW 48.03, and its practices, policies, and operation have always been found in accordance with the licensing statutes. Nor has the Commissioner in the exercise of his other powers of investigation and rule making ever found the Bureau in violation of RCW 48.19.170.

This long-established, contemporaneous, and authoritative construction of the licensing requirements as applied to the Bureau and the trustees is contrary to the one urged by plaintiffs and is entitled to great weight in determining the intent and meaning of RCW 48.19.170(2). *See John H. Sellen Constr. Co. v. State Department of Revenue*, 87 Wn.2d 878, 558 P.2d 1342 (1976); *Northern Pac. Ry. v. Henneford*, 9 Wn.2d 18, 21, 113 P.2d 545 (1941).

Plaintiffs contend, however, that the Commissioner, by intervening in this action in their support, has repudiated any construction of RCW 48.19.170(2) which favors the legality of the behavior of the trustees. This argument misconstrues the rationale of this rule of statutory construction. The executive interpretation of the licensing provisions entitled to basic consideration in determining their meaning was the one contemporaneous with the enactment of RCW 48.19.170, and followed at all times prior to the Commissioner's intervention in this litigation. The original interpretation is "given special consideration since it was made at a time when the circumstances leading up to the enactment of the statute are well known." 2A C. Sands, *Statutes and Statutory Construction* § 49.08, at 255 (4th ed. 1973). Against the Commissioner's contemporaneous and long-standing position that the trustees are not in violation of the licensing provisions, the Commissioner's recent *ad hoc* interpretation of the provisions asserted for the first time in this litigation is entitled to no special weight. *United States v. Leslie Salt Co.*, 350 U.S. 383, 396, 100 L. Ed. 441, 76 S. Ct. 416 (1956). This principle is especially applicable when the Commissioner has made such an *ad*

*hoc* interpretation without following the procedure provided by statute following a hearing. RCW 48.03.040; 48.19.190.

In addition, the interpretation of RCW 48.19.170(2) giving the trustees no right or duty to operate and administer the Bureau has been reasonably relied upon by the entire insurance industry in Washington and the state's only rating organization from the time the Bureau's declaration of trust was approved and its first license granted in 1947.

> One of the soundest reasons sustaining contemporaneous interpretations of long standing is the fact that reliance has been placed thereon by the public and those having an interest in the interpretation of the law.

(Footnote omitted.) 2A C. Sands, *Statutes and Statutory Construction* § 49.07, at 252 (4th ed. 1973).

Finally, this court's own examination of the trust declaration and the requirements of RCW 48.19.170(2) leads us to conclude the trustees have no right or duty to operate or administer the rating organization.

Prior to 1947, the Bureau like most rating organizations was owned by its insurance company subscribers. The problem faced by the legislature in drafting RCW 48.19 was to avoid confiscating the Bureau while still preventing the insurance companies from using rating organizations as a means of combining to set rates. The solution adopted in RCW 48.19.170(2) retains the desirable prior statutory requirement that all rating organizations be operated on a public service basis. Laws of 1911, ch. 49, § 74, p. 210. In addition, a qualified ownership of the rating organization is given to the insurance company subscribers of the rating organization in trust for their benefit. RCW 48.19.170(2)(b). The insurers are then prevented from combining for rate setting by a provision which states the rating organization "shall not be connected with any insurer or insurers except to the extent that any such insurer may be a subscriber to its services." RCW 48.19.170(2)(c). Further provision is made, however, for the formation of a committee of subscribers, and for consultation and cooperation by the committee with the rating organization within the limits of RCW 48.19. RCW 48.19.230, .250.

Thus, the Committee, which owned the stock of the Bureau's holding company, met the requirement of RCW 48.19.170(2)(b) by placing this stock in trust for the benefit of its insurance company subscribers. In addition, by virtue of (2)(c), the subscribers could no longer direct the administration or management of the Bureau. Nor could the trustees do so, for they are under a duty to the insurance company beneficiaries to administer the trust solely in their interest. Restatement (Second) of Trusts § 170 (1959). For the trustees to administer the Bureau, there would be a violation of the "no connection" provision of (2)(c), and conceivably there could be a violation of the provision of (2)(b) that the trust be administered in the public interest. Any connection permitted by RCW 48.19 between a rating organization and insurer subscribers is an exception to the anti-compact statute of the insurance code (RCW 48.30.020) and must be strictly construed. *Insurance Co. of N. America Cos. v. Sullivan*, 56 Wn.2d 251, 257, 352 P.2d 193 (1960).

In addition, since the trustees' "ownership" of the Bureau is limited to owning the shares of the Corporation, management of the Corporation is not within their direct power. Management power of the Corporation is vested in the directors of the Corporation. RCW 23A.08.340; *Lycette v. Green River Gorge, Inc.*, 21 Wn.2d 859, 862, 153 P.2d 873 (1944). Such power does not include managing the Bureau —a separate business. Nor is such power conferred upon trustees either by statute or trust declaration approved by the Commissioner. A fortiori, the trustees have no direct power to manage the Bureau's business. Our construction of the trust declaration is consistent with the rule, subject to exceptions not applicable here, that a trustee can properly exercise only such powers as "(a) are conferred upon him in specific words by the terms of the trust, or (b) are necessary or appropriate to carry out the purposes of the trust and are not forbidden by the terms of the trust." Restatement (Second) of Trusts § 186 (1959).

We hold, therefore, that RCW 48.19.170(2) does not re-

quire or permit the trustees of the ownership of the rating organization to administer or operate the rating organization.[5] Although unnecessary to support the substantive rule we adopt here concerning the lack of power in the trustees to administer or operate the rating bureau, we call attention to a serious procedural obstacle to the relief granted below.

An injunction cannot issue in an action for removal of a trustee if the insurance company beneficiaries, not made parties to the action by service of process, are indispensable parties. They are indispensable when there is a conflict of interest between these beneficiaries and the plaintiffs. To remove trustees for the subscribers and appoint others without giving the subscribers an opportunity to be heard is to deny the subscribers due process of law. *See In re Trusts Created by Hormel*, 282 Minn. 197, 204-05, 163 N.W.2d 844 (1968); *Elias v. Schweyer*, 13 App. Div. 336, 338-40, 43 N.Y.S. 55 (1897); cf. *Bowles v. Superior Court*, 44 Cal. 2d 574, 587-88, 283 P.2d 704 (1955). Without such indispensable parties before the court, the trial court would be without lawful power to decide the case on the merits even if it could otherwise do so. *In re Estate of*

---

[5]We are not required for the purposes of this appeal to determine under whose control and direction, if any, RCW 48.19 contemplates each rating organization will be managed. The Commissioner's responsibility is to issue, revoke, or suspend the operating license of each rating organization pursuant to statutory procedures for this purpose. RCW 48.19. The Commissioner may wish to pursue that question in a separate proceeding in procedures which we outline below as available to the plaintiffs. The testimony of a former manager of the Bureau, in a deposition introduced in evidence below, suggests the possibility that RCW 48.19 contemplates no direct control of a rating organization from the outside, other than from the forces of the marketplace and supervision by the Commissioner. In case of mismanagement of the rating organization, it is suggested, the subscribing insurance companies would decide to no longer patronize the rating organization. Someone else would then go into the business of furnishing a rating service, comply with the licensing provisions, and the companies if satisfied with the offering would begin patronizing this other rating organization. We only mention this testimony as one possible explanation of the failure of RCW 48.19 to specify who is to control a rating organization. The Commissioner is not, however, bound to adopt its reasoning.

*Bellinger,* 35 App. Div. 2d 1078, 1079, 317 N.Y.S.2d 126 (1970).

Disposition of the Case

The remaining question is whether in addition to reversal of the summary judgment, plaintiffs' and Commissioner's remaining complaints should be dismissed because of the availability of an exclusive or adequate administrative remedy to deal with them. At least one material question of fact remains in dispute. This is whether or not the Committee or the Bureau subscribers directly or indirectly in fact control the operation of the Bureau in violation of RCW 48.19.170(2)(c). Defendants claim the Committee and Bureau subscribers do not control the Bureau's operation.

The resolution of this issue should not, however, be in superior court. Under the doctrine of exhaustion of remedies, when a claim is cognizable in the first instance by an agency alone, this administrative remedy must be exhausted before the courts will intervene. *Wright v. Woodard,* 83 Wn.2d 378, 381, 518 P.2d 718 (1974). The principle "is founded upon the belief that the judiciary should give proper deference to that body possessing expertise in areas outside the conventional experience of judges." *Robinson v. Dow,* 522 F.2d 855, 857 (6th Cir. 1975). RCW 48.19.310 provides a means whereby any person aggrieved by the application of the rating system of a rating organization may have his claim heard and resolved. The statute provides for complaint directly to the rating organization,[6] and for a subsequent hearing and action by the Insurance Commissioner either affirming or reversing the action of the rating organization. The hearing by the Commissioner is held in accordance with the comprehensive procedures set forth in RCW 48.04. RCW 48.04.010(1)(a). The complaint of the union and its members alleges improper rating of plaintiff-owned buildings resulting in unlawfully high fire

---

[6] A complainant may also make use of RCW 48.19.300 which states the rating organization shall, for a reasonable charge, furnish to any insured or its authorized representative, all pertinent information relative to any rate promulgated by the rating organization on property in which the insured has an interest.

insurance rates, caused by improper management of the Bureau. The administrative remedy of RCW 48.19.310 and RCW 48.04 "establishes clearly defined machinery for the submission, evaluation and resolution of complaints by aggrieved parties. . . . Exhaustion of the administrative remedy is a jurisdictional prerequisite to resort to the courts." *Bennett v. Borden, Inc.*, ............ Cal. App. 3d ............, 128 Cal. Rptr. 627, 628 (1976). Thus, if the union and member plaintiffs desire to pursue their other claims, they must first utilize the procedures provided by RCW 48.19.310 and RCW 48.04.[7] *Gordon v. Hardware Mut. Cas. Co.*, 361 Mass. 582, 281 N.E.2d 573 (1972); *General Mut. Ins. Co. v. Mutual Ins. Rating Bureau*, 23 Misc. 2d 991, 204 N.Y.S.2d 679 (1960).

We last consider the adequacy of the administrative remedy with respect to this remaining question of fact. RCW 48.02.080(3) empowers the Commissioner to bring suit to enjoin violations of the code. If this statutory provision was the only statutory provision applicable, it would permit his continuation of this suit in superior court if the Commissioner had cause to believe either the Committee or the subscribers to the bureau were improperly controlling the Bureau in violation of the licensing provisions of RCW 48.19.170(2).

Plaintiffs and Commissioner, however, have not sought specific, independent, permanent injunctive relief against illegal control as such. They have relied upon their claim of control to seek court ordered removal and replacement of defendant trustees. If plaintiffs seek independent relief against illegal control as such, their remedy is an administrative one, namely, a cease and desist order from the Com-

---

[7] Since the question of whether the trustees had a duty or right to administer or operate the Bureau was purely one of law rather than fact, we have chosen to resolve it, and failure to exhaust administrative remedies does not necessarily preclude such resolution. *See, e.g., Merry Heart Nursing & Convalescent Home, Inc. v. Dougherty*, 131 N.J. Super. 412, 417, 330 A.2d 370 (1974); *Byer v. New York*, 50 App. Div. 2d 771, 377 N.Y.S.2d 52, 53 (1975). We also note that any facts determined by the trial court in the proceeding below are not controlling in a de novo hearing before the Insurance Commissioner.

missioner upon a proper showing. See footnote 8 below. If, however, the presence of such claimed control were relied on to obtain court ordered Bureau license suspension or revocation, the court would be asked to perform a function which the statutes next cited leave exclusively to the Commissioner pursuant to administrative procedures for that purpose. These procedures call first for a hearing before the Commissioner with provision for an appeal to the superior court, and are intended to protect the licensee from arbitrary revocation or suspension of his license. The hearing must be fair and impartial. *Cuddy v. Department of Pub. Assistance*, 74 Wn.2d 17, 19, 442 P.2d 617 (1968). *See* RCW 34.04.

Such proceedings before the Insurance Commissioner empower the Commissioner to grant relief pursuant to RCW 48.19.310 and RCW 48.02.080 (3) (a) and to suspend or revoke the license of the rating organization pursuant to RCW 48.19.190. In such proceeding or proceedings he has power to determine whether the Committee of the subscribers to the Bureau is improperly controlling the Bureau in violation of the licensing provisions of RCW 48.19.170 (2). In determining that question, the interpretation of the trustees' duties we have adopted in this opinion would be binding on the Commissioner. Furthermore, the Commissioner, prior to the hearing may properly promulgate a rule pursuant to RCW 48.02.060 (3) (a) setting forth what person or persons, if any, have responsibility to administer and operate rating organizations. See footnote 2. As noted, RCW 48.19 has no such requirement. In fairness, after these many years of operation without any such rule or determination, any such rule now could be adopted in a rule-making proceeding and applied prospectively, rather than being formulated through *ad hoc* adjudication applied retrospectively in license revocation hearings. *SEC v. Chenery Corp.*, 332 U.S. 194, 202, 91 L. Ed. 1995, 67 S. Ct. 1575 (1947); *NLRB v. Majestic Weaving Co.*, 355 F.2d 854, 860-61 (2d Cir. 1966); *Sun Ray Drive-In Dairy, Inc. v. Oregon Liquor Control Comm'n*, 16 Ore. App. 63, 517 P.2d 289 (1972); *see*

C. Peck, *A Critique of the National Labor Relations Board's Performance in Policy Formulation: Adjudication and Rule-Making*, 117 U. Penn. L.R. 254, 260-72 (1968).

 Insofar as any additional relief sought in this case can be obtained by resort to an exclusive or adequate administrative remedy, resort to the court for injunctive relief under RCW 48.02.080(3)(b) is unavailable. *See Sunny Brook Farms v. Omdahl*, 42 Wn.2d 788, 259 P.2d 383 (1953); *Wilkes v. Hunt*, 4 Wash. 100, 101, 29 P. 830 (1892). The statute does not purport to expand the circumstances under which an injunction will issue or to deprive a defendant of any defense he may have to the issuance of an injunction.[8]

Since plaintiffs and Commissioner have an exclusive or adequate remedy at law to obtain any additional relief they seek, the summary judgment must be reversed and the cause dismissed.

It is so ordered.

STAFFORD, C.J., HAMILTON, UTTER, BRACHTENBACH, and DOLLIVER, JJ., and HALE, J. Pro Tem., concur.

HUNTER, J. (dissenting)—I disagree both with the majority's interpretation of RCW 48.19.170(2) and with the resulting failure to resolve the major issue presented in this case; namely, who has the responsibility to manage and control insurance rating organizations licensed under that statute. I further think that the case should not be dismissed because the issue is properly presented through the Insurance Commissioner's unopposed intervention. In addi-

[8]RCW 48.02.080(3)(a), it is true, empowers the Commissioner to issue an administrative cease and desist order to stop a person from presently violating or proposing to violate any provision of the insurance code or any regulation or order of the Commissioner "and/or" bring a court action to enjoin any person from so doing. The use of "and/or" must be understood in light of long-established principle limiting the use of injunction to cases when the remedy at law is unavailable or otherwise inadequate. Thus if a cease and desist order is being disobeyed or is about to be disobeyed, the Commissioner's remedy is inadequate and injunctive relief is appropriate to enforce the cease and desist order. If the cease and desist order is being obeyed, no injunctive relief is available because the administrative remedy is adequate.

tion, I would affirm the trial court because the trial court's solution properly causes the Washington Surveying and Rating Bureau (Bureau) to be administered and controlled pursuant to the licensing requirements of RCW 48.19.170(2), and in the absence of improper connections with any insurer. Therefore I dissent.

The purpose of the statutory scheme in RCW 48.19.170, as the majority points out, is to permit the insurance companies to act together in determining rates notwithstanding anti-trust implications. But, as the majority also notes, any connection between a rating organization and its insurer subscribers permitted by RCW 48.19 is an exception to the anti-compact section of the insurance code, *see* RCW 48.30.020, and must be strictly construed. *See Insurance Co. of N. America Cos. v. Sullivan,* 56 Wn.2d 251, 257, 352 P.2d 193 (1960). In order to come within RCW 48.19.170(2), therefore, a rating organization must meet the requirements set forth therein, and it is this statute alone that sets forth the conditions that must be met in order for a license to issue.

Consequently, the controlling issue in the present case is the interpretation of RCW 48.19.170, which as admitted even by the majority is somewhat undefined. At this point it also should be noted that any prior administrative interpretations of the statute by insurance commissioners is never controlling upon the courts in determining legislative intent as to what a statute means. *See Hama Hama Co. v. Shorelines Hearings Bd.,* 85 Wn.2d 441, 448, 536 P.2d 157 (1975).

A reading of the statute, however, ineluctably demonstrates that any interpretation must include who has the duty to manage and conduct a rating organization licensed thereunder "as a nonprofit public service institution."[9] The statute, after stating that the ownership of a rating organi-

---

[9] The text of RCW 48.19.170(2)(b) reads as follows:

"The ownership of such rating organization shall be vested in trustees for all its subscribers under such trust agreement as is approved by the commissioner, and the rating organization shall be and shall be conducted as a nonprofit public service institution."

zation shall be vested in trustees, goes on in the same sentence to state the fashion in which it shall be conducted. I interpret this to mean that the trustees as nominal owners of the rating organization are also the ones with the responsibility for its conduct and operation in compliance with the statute. Under the scheme set up pursuant to the statute, the trustees are the only logical parties to do so and it appears that this is what the legislature intended.

Undoubtedly, the legislature intended to prevent the insurance companies from combining to set rates, and yet still allow the operation of rating organizations set up by the insurance industry. This is the reason the statutory scheme requires that ownership be placed in the hands of trustees for rating organization subscribers rather than in the subscribers themselves. In addition, RCW 48.19.170 (2) (c) explicitly prohibits any connection between the rating organization and the insurance subscribers other than as subscribers.

The statute, however, which defines the required conditions for licensing of rating organizations is the sole basis for permitting a rating organization to operate. Certainly the connection resulting from the trustees' relationship with the subscribers as trustees is not, as the majority suggests, the type of connection to which RCW 48.19.170 (2) (c) is directed. The more sensible interpretation of these provisions is that the trustees have a duty imposed by statute to conduct the rating organization as required by RCW 48.19.170 (2), the statute without which such organizations could not exist at all. The prohibition against any connection between a rating organization and its subscribers does not include the trustee relationship itself, which is, after all, subject to RCW 48.19.170 (2), which allows rating organizations in the first place. In other words, the trustees have a statutory duty to conduct the rating organization in accordance with RCW 48.19.170 (2); the statute necessarily gives them the power to do so in order to carry out the purpose of the trust, which exists only by virtue of the specific legislation.

Moreover, it is wholly inappropriate to send this case back to the Commissioner for a determination of who has the duty to control and direct a rating organization licensed under RCW 48.19.170(2). The question is one of statutory interpretation and is clearly judicial in nature. *See State ex rel. Humiston v. Meyers,* 61 Wn.2d 772, 777, 380 P.2d 735 (1963). As such, in the final analysis it can be settled only by this court. *See Floe v. Cedergreen Frozen Pack Corp.,* 37 Wn.2d 886, 226 P.2d 871 (1951); cf. *In re Juvenile Director,* 87 Wn.2d 232, 241, 552 P.2d 163 (1976). Any determination made by the Commissioner will not be binding on a review court because the interpretation of the statute is a pure question of state law of which this court is the final arbiter. *See Leschi Improvement Council v. State Highway Comm'n,* 84 Wn. 271, 286, 525 P.2d 774 (1974); *Zappala v. Industrial Ins. Comm'n,* 82 Wash. 314, 321, 144 P. 54 (1914). This is true since, as mentioned earlier, an administrative interpretation, while entitled to great weight where a statute is ambiguous, is still never controlling upon the courts. *See M & M Leasing Corp. v. Seattle-First Nat'l Bank,* 391 F. Supp. 1290, 1295 (W.D. Wash. 1975) (Sharp, J.); *Hama Hama Co. v. Shorelines Hearings Bd., supra.* Even the parties cannot bind the court by their stipulations of law. *See Rusan's, Inc. v. State,* 78 Wn.2d 601, 606, 478 P.2d 724 (1970). Similarly, the legislature may not take from the courts the right to determine the law, and furthermore, it would be impermissible for the courts to surrender "the duty imposed upon them by the constitution to determine the law." *In re Buffelen Lumber & Mfg. Co.,* 32 Wn.2d 205, 209, 201 P.2d 194 (1948). Thus, it is entirely improper in the present case for this court in effect to remand to the Commissioner the basic question of who has the responsibility to conduct a rating organization in compliance with RCW 48.19.170. The interpretation of the statute is an obligation of this court and I would adopt the interpretation expressed above.

I also, of course, disagree with the majority's disposition of this case. Even if the plaintiffs other than the Commis-

sioner may properly be relegated to administrative remedies, there can be no doubt that the Commissioner may resort to the courts in order to enforce compliance with his regulations or applicable statutory provisions. RCW 48.02.080(3) specifically provides:

> If the commissioner has cause to believe that any person is violating or is about to violate any provision of this code or any regulation or order of the commissioner, he may:
> . . . and/or
> (b) bring an action in any court of competent jurisdiction to enjoin the person from continuing the violation or doing any action in furtherance thereof.

The majority's passing reference to this section does not adequately demonstrate any limitation upon the Commissioner's power to bring an action pursuant to this section. Since the Commissioner has the power and authority to institute and pursue court actions in order to enforce statutory provisions whenever they are being violated, then surely he can intervene in ongoing lawsuits to accomplish the same result. The majority recognizes this, at least tacitly, when it disposes of the standing issue based on the statutory standing of the Commissioner.

In the present case, the Commissioner chose to proceed with this particular method of enforcement by intervening in a private lawsuit seeking to enforce the statutory requirements of RCW 48.19.170. There is no reason to compel the Commissioner to utilize other procedures that may be available to him, especially in light of the legal nature of the question involved, as mentioned above. Furthermore, any decision of the Commissioner in this matter will be subject to the review procedures of the administrative procedures act, see RCW 34.04.150, and thus will present questions upon which the superior court, and ultimately this court, must pass. See RCW 34.04.070; .080; .130; .140.

Likewise, the Commissioner is not, as the majority suggests, precluded by any prior position on this matter from

now exercising the statutory power contained in RCW 48.02.080(3)(b).

> The failure of [state officers] to enforce any law may never estop the people to enforce that law either then or at any future time. It would be as logical to argue that the people may not proceed to convict a defendant of burglary because the sheriff perhaps saw him and failed to stop him or arrest him for another burglary committed the night before.

*Kueckelhan v. Federal Old Line Ins. Co.*, 69 Wn.2d 392, 413, 418 P.2d 443 (1966), quoting *Caminetti v. State Mut. Life Ins. Co.*, 52 Cal. App. 2d 321, 325, 126 P.2d 165 (1942). RCW 48.02.080(3)(b) unambiguously empowers the commissioner to utilize court actions to enforce statutory requirements. The failure of the Commissioner previously to challenge the appellants' interpretation of the statute cannot prevent him from now enforcing the mandate of RCW 48.19.170(2) via court proceeding.

In addition, I would affirm the trial court upon the following reasoning. The Trust Declaration related to the Bureau specifically states its purpose as "enabling said Bureau to qualify under [RCW 48.19.170] ." It also states that the trustees are subject to the direction of the insurance company subscribers and that the subscribers may remove the trustees by majority vote. The trial court properly disregards this latter aspect of the Trust Declaration and gave effect instead to its stated purpose of qualifying the Bureau under RCW 48.19.170. The alternative would have been suspension of the license since such subscriber control over the trustees would be contrary to RCW 48.19.170(2)(c). The trustees in any event have no duty to comply with any trust provision that is illegal or contrary to public policy. *See* Restatement (Second) of Trusts §§ 60, 62, 65, 166 (1959). The last mentioned provision is certainly contrary to the requirements and the public policy of RCW 48.19.170 and thus the trustees are under no duty to comply with it. Consequently, proper trustees may conduct the Bureau in the fashion necessary to qualify it under the conditions of the licensing statute.

The trial court, in the exercise of its equitable power to carry out the purpose of the statute and the public interest involved, and the trust declaration pursuant thereto, properly removed the trustees who are directly connected with the insurance industry, and appointed trustees qualified to operate the bureaus independent of the control of the insurance industry or the insurance subscribers. *See* 76 Am. Jur. 2d *Trusts* § 130 (1975). *See also* 27 Am. Jur. 2d *Equity* § 104 (1966); *Virginian Ry. v. System Federation No. 40, Railway Employees,* 300 U.S. 515, 81 L. Ed. 789, 57 S. Ct. 592 (1937).

The majority for the first time has raised the issue of the joinder of the insurance subscribers in the action. The record shows, however, that the Washington Surveying and Rating Bureau, the Washington Bureau (a corporation), the trustees, and Roe Corporations 1 through 200, were joined as parties to this action in the summons and complaint. The record is silent as to proper service having been obtained.

In any event, I see no necessity of joining the some 200 insurance subscribers who, by the statute, were prohibited from having any connection with or control over the trustees.

For the reasons heretofore stated, I would affirm the trial court.

ROSELLINI, J., concurs with HUNTER, J.